## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

Brian P. Carr,
Rueangrong Carr, and
Buakhao Von Kramer
        Plaintiffs
                versus

United States,
US Department of Justice,
USPS, USPS OIG, USPS BoG,
US CIGIE, Department of State,
Department of State OIG,
USCIS, DHS OIG, and SSA
        Defendants

Civil No. 3-23CV2875 - S

Amended
COMPLAINT

The Plaintiffs, Brian P. Carr (hereafter referred to as Mr. Carr), Rueangrong Carr (hereafter referred to as Mrs. Carr) and Buakhao Von Kramer (hereafter Mrs. Von Kramer) appear pro se in this matter, as and for their complaint allege the following:

### Introduction

1.  This matter concerns the Defendants falsification of government records and, potentially, obstruction of justice through failure to report or correct federal crimes, and the Plaintiffs' Fifth Amendment right to due process of law.

### Due Process Requirements

2.  Almost all of the counts raised in this matter center around due process.   Since the 70's the U.S. Supreme Court has expounded on the requirements of Due Process for administrative procedures such that it is not an obscure arcane right, but rather a central pillar of how the U.S. government must act when dealing with individuals.  There is an excellent overview of 'due process' in Cornell Law LII Procedural Due Process which lists the ten key elements required for due process as:

1. An unbiased tribunal.

2. Notice of the proposed action and the grounds asserted for it.

3. Opportunity to present reasons why the proposed action should not be taken.

4. The right to present evidence, including the right to call witnesses.

5. The right to know opposing evidence.

6. The right to cross-examine adverse witnesses.

7. A decision based exclusively on the evidence presented.

8. Opportunity to be represented by counsel.

9. Requirement that the tribunal prepare a record of the evidence presented.

10. Requirement that the tribunal prepare written findings of fact and reasons for its decision

These elements are derived from Judge Henry Friendly's article titled "Some Kind of Hearing".

USPS Falsifies Delivery Record

3.   In April of 2021, Mr. Carr purchased a guaranteed delivery Express Mail label from the United States Postal Service (hereafter USPS).  The package was delivered late but a postal employee falsified the delivery record to indicate that package was delivered on time.  As a result, Mr. Carr was unable to get the guaranteed refund of $26.35.  Mr. Carr appealed administratively with USPS and later with USPS Office of the Inspector General (hereafter USPS OIG),  the Council of the Inspectors General on Integrity and Efficiency (hereafter CIGIE), USPS Board of Governors, and Department of Justice (hereafter DoJ) to correct the falsified documents and get the requested refund.  No refund has been received.

Department of State Denies Non-Immigrant Visa Without Due Process

4.  In 2018 and 2019 Mrs. Carr and her sister, Mrs. Von Kramer, applied for non-immigrant visas which were denied by the Department of State (hereafter DoS) through the Bureau of Consular Affairs (hereafter BCA) without due process.  In particular, the denial was a form letter with no reference to the actual evidence and which contradicted the verbal explanations of the denial by the interviewer.  This could be construed as falsification of government records through omission of required information.  Further, in each case the denial was based on a rationale that was not supported by the evidence or law in the matter.  As there was no administrative appeal available, Mr. Carr sought correction of the injustice through the DoS OIG. CIGIE, and DoJ.  Later non-immigrant visas for Mrs. Carr and Mrs. Von Kramer were

approved in 2022 but both sisters suffered financial harm from the delay in receipt of the visas.

### Mrs. Von Kramer Receives Survivor Benefits

5.  Mrs. Von Kramer is the widow of a deceased American veteran and was able to visit the U.S. in 2022 and commenced receiving survivors' benefits from Social Security in May of 2023, but she must return to the U.S. every six months as she was not able to establish her 'lawful presence' in the U.S. in 2019, 2020, and 2021 as she planned.

### USCIS Denies Citizenship Application Based on Falsified Documents

6.  On 31 Jan 2023 as a result of a joint interview held on 30 Jan 2023 for a permanent green card (I-751) and for citizenship (N-400), the United States Citizenship and Immigration Service (USCIS) approved Mrs. Carr's I-751 application for a permanent green card while not actually providing the green card as her N-400 citizenship application was also approved.

7.  However, instead promptly providing Mrs. Carr with a Certificate of Naturalization, on 01 Sep 2023, USCIS updated her N-400 record to note that the interview of 30 Jan 2023 was canceled due to unforeseen circumstances.

8.  Mr. Carr complained to USCIS, the Department of Homeland Security (DHS) OIG and DoJ of falsified records (the interview had been completed and the N-400 had been approved). Even so, USCIS scheduled a 'second' N-400 interview for 11 Oct 2023, a date when USCIS had been informed that Mrs. Carr would be out of the country.  Mr. and Mrs. Carr made numerous efforts to reschedule the interview which were refused.  USCIS denied Mrs. Carr's N-400 application on 14 Oct 2023 for 'failure to appear'.  Mr. Carr has since complained to DHS OIG of 'whistleblower' retaliation for his previous reports of federal crimes and other malfeasance by USCIS.

### Jurisdiction and Venue

9.  This Court has subject matter jurisdiction over this action pursuant to 28 USC § 1331 and 28 USC § 1367,  42 USC Ch. 21B and the Administrative Procedure Act (APA, 5 USC §§ 551–559, 5 USC §702), as a case arising under 18 USC § 1001, 18 USC § 1505, 18 USC §

1510, 18 USC § 201,  18 USC Ch 96 (RICO), 18 USC § 1038  18 USC § 10, 5a USC IG ACT 1978, 39 USC, 8 USC Ch 12, 8 CFR § 216.4, 5 USC § 2302(b)(9)(D), 8 USC § 1421(c) as well as the Fifth Amendment of the U.S. Constitution right to due process.

10.  Venue is proper in this district pursuant to 28 USC § 1391 (b) because a substantial part of the events or omissions giving rise to the claim have occurred or will occur in this district and Plaintiffs Mr. and Mrs. Carr reside in this District and Mrs. Von Kramer, as a foreign national, receives her U.S. mail care of Mr. Carr.

11.  Mr. Brian P. Carr (hereafter Mr. Carr) is a U.S. citizen and resident of Dallas County in the State of Texas and a Plaintiff appearing Pro Se in this matter.  Mr. Carr's contact information is:

Brian P. Carr
1201 Brady Dr
Irving, TX 75061
carrbp@gmail.com
518-227-0129

12.  Mrs. Rueangrong Carr (hereafter Mrs. Carr) is a U.S. Permanent Resident and resident of Dallas County in the State of Texas and a Plaintiff appearing Pro Se in this matter.  Mr. Carr is Mrs. Carr's spouse and to the degree that it is legally permissible, Mr. Carr will represent Mrs. Carr.  Mrs. Carr's contact information is:

Rueangrong Carr
1201 Brady Dr
Irving, TX 75061
carrbp@gmail.com
518-227-0129

13.  Mrs. Buakhao Von Kramer (hereafter Mrs. Von Kramer) is a citizen and resident of Thailand with a U.S. B-1 / B-2 non immigrant visa (business / tourist).  Mrs. Von Kramer's U.S. mailing address is care of Mr. Carr, a resident of Dallas County in the State of Texas. Mrs.Von Kramer is a Plaintiff appearing Pro Se in this matter.  Mrs. Von Kramer is the widow of Nikolaus Von Kramer, a German National, U.S. Army veteran (pre 1968), U.S. citizen, married to Mrs. Von Kramer on 12 January 2006, and died 26 April 2014.  Mrs. Von Kramer is also Mrs. Carr's sister.   Mrs. Von Kramer has also requested that Mr. Carr represent Mrs. Von Kramer to the degree that it is legally permissible.  Mrs. Von Kramer's

contact information is:

Buakhao Von Kramer
c/o Brian Carr
1201 Brady Dr
Irving, TX 75061
carrbp@gmail.com
518-227-0129

14.  Mrs. Von Kramer's legal residence is:

105 - 3 M 5 T YANGNERNG
SARAPEE, CHIANG MAI 50140
THAILAND

15.  The United States government is the primary Defendant in this matter and is represented by

the U.S. Attorney for the Northern District of Texas in her professional capacity with contact

information:

United States Attorney
Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

16.  The U.S. Department of Justice (hereafter DoJ) is an agency of the United States, a

Defendant in this matter and is represented by the Attorney General in his professional

capacity with contact information:

Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

17.  The United States Postal Service (hereafter USPS) is an agency of the United States, a

Defendant in this matter and is represented by the Postmaster General in his professional

capacity with contact information:

Postmaster General
USPS Headquarters
475 L'Enfant Plaza SW
Washington DC 20260-0010

18.  The USPS Office of the Inspector General (hereafter OIG) is an agency of the United States,

a Defendant in this matter and is represented by the USPS Inspector General in her

professional capacity with contact information:

USPS Inspector General
1735 North Lynn Street
Arlington, VA 22209-2005

19. The USPS Board of Governors (BoG) is the governing body of the USPS, an agency of the United States. The USPS BoG is a Defendant in this matter and is represented by the Chairman in his professional capacity with contact information:

USPS Board of Governors Chairman
475 L'Enfant Plaza SW
Washington DC 20260-0010

20. The U.S. Department of State (hereafter DoS) is an agency of the United States, a Defendant in this matter and is represented by the Secretary of State in his professional capacity with contact information:

The Executive Office
Office of the Legal Adviser, Suite 5.600
600 19th Street Ste 5, Suite 5 600, NW
Washington, D.C. 20522

21. The DoS OIG is an agency of the United States, a Defendant in this matter and is represented by the DoS Inspector General in her professional capacity with contact information:

U.S. Department of State Inspector General
1700 North Moore Street (SA-39)
Arlington, VA 22209

22. The Council of the Inspectors General on Integrity and Efficiency (hereafter CIGIE) is an agency of the United States, a Defendant in this matter and is represented by the Executive Director in his professional capacity with contact information:

Executive Director
Council of the Inspectors General on Integrity and Efficiency
1750 H Street NW Suite 400
Washington, DC 20006

23. The U.S. Citizenship and Immigration Services (hereafter USCIS) is an agency of the United States, a Defendant in this matter and is represented by the USCIS Director in her professional capacity with contact information:

USCIS Director
20 Massachusetts Avenue, NW
Washington, DC 20529

24. The Department of Homeland Security (hereafter DHS)  OIG is an agency of the United

States which oversees USCIS, a Defendant in this matter and is represented by the DHS

Inspector General in his professional capacity with contact information:

Department of Homeland Security Inspector General
245 Murray Dr.; Building 410;
Washington, DC 20528

25. The Social Security Administration (hereafter SSA) is an agency of the United States, a

Defendant in this matter and is represented by the SSA Commissioner in her professional

capacity with contact information:

Social Security Administration Commissioner
1300 D. Street SW
Washington, D.C. 20024

## Count 1

### USPS Falsifies Delivery Records, Refuses Credit

26. The Plaintiffs repeat and re-allege paragraphs 1 through 25, as if fully set forth herein.

27. On April 9, 2021 Mr. Carr purchased an 'Overnight Express' click'n'ship for $26.35 with

tracking number 9470103699300057573507 with guaranteed delivery to return his passport

from the Thai embassy to his home address. The Thai embassy mailed his passport back and

the shipment was accepted by USPS at 8:46PM on 13 April 2021 with guaranteed delivery

by 12PM on 15 April 2021.  This was longer than overnight as it was received late in the

day.

28. However, the package did not arrive at the Irving Post Office until 11:18 AM 15 April 2021

and was 'out for delivery' at 11:29 AM.  It was scanned as delivered at 11:35 while the driver

was almost certainly still at the Post Office, a common practice for improper 'Stop the Clock'

scans.

29. It is virtually impossible to make the drive from the Post Office to Mr. Carr's house in six

minutes. Note that while improper 'Stop the Clock' scans have a relatively benign name, they

are, in fact, crimes of falsifying government records as per 18 U.S. Code Section 1001 (a)

(1).

30. Mr. Carr was anxious to get his passport and checked for the package several times on the morning of 15 April, 2021. When Mr. Carr received notice of the delivery at 11:35 AM via email, both Mr. Carr and Mrs. Carr went out to look for the package but could not find it.

31. Mr. Carr also called the Post Office about the missing package and was advised to not worry as there had been vehicle problems that morning and that his package would arrive soon. Mr. Carr asked if the record of delivery time would be corrected but received a non-committal answer. Mr. Carr also took a time stamped photo of the front porch area with no package present after it had been recorded as delivered.

32. At 12:30PM the package was in Mr. Carr's mail box, delivered after the guaranteed delivery time (contrary to the improper 'Stop the Clock' delivery scan).

33. That afternoon Mr. Carr initiated an online request for a refund (refund request number 6006595) which was denied in minutes as the package was falsely reported as delivered on time.

34. Two weeks later Mr. Carr was permitted to appeal that arbitrary denial and explained about the illegal 'Stop the Clock' scan and on 5 May 2021 the status of the refund was changed to 'Dispute Paid'. However, the credit card which Mr. Carr used for the online 'click n ship' never posted the refund.

35. On 9 June, 2021, Mr. Scott Hooper, District Manager, Dallas Customer Service and Sales, 951 W. Bethel Rd., Coppel, Texas, 75099-9998 replied to Mr. Carr's queries about the falsified delivery time via Congressman Veasey stating that Mr. Rodney Malone, Postmaster, Irving, TX found that "the guaranteed date and time for delivery of the Priority Express Mail was April 15, 2031, by noon. Mr. Malone retrieved data from the carrier's scanner and was able to confirm the package was scanned delivered on April 15, 2021 at 11:35 a.m.. Mr. Malone states the carrier has been trained in the proper disposition and scanning of Priority Express Mail. The signature was waived; therefore, allowing delivery directly to Mr. Carr's mailbox. Unfortunately, to be able to correct a scan in our system, it must be within the previous 21 calendar days."

36. Mr. Carr contacted USPS customer service on numerous occasions as there had not been any refund but was only told to wait longer for the refund even though he had already waited far longer than the suggested waiting time.

37. When Mr. Carr complained that the refund was due many months ago, the response was just a generic statement about submitting a new refund request (which would be denied as it was too late to initiate a new refund request). See service request 28670242 on 19 July 2021.

38. On 3 September 2021, Ms. Scarpelli of the USPS responded to Congressman Veasey stating that Mr. Carr's refund was paid on 5 May 2021 but on further investigation by Mr. Carr there were no details of the refund.

39. After Mr. Carr made numerous attempts to find the transaction ID of the credit to his bank it became apparent that Ms. Scarpelli had been misled by the numerous falsified documents which resulted from the improper 'stop the clock' scan of his package and faulty USPS business processes to issue credits when a falsified delivery record indicates an 'on time' delivery.

40. It appears that the Accounting Service Center approved the refund and passed it off to Customer Service to make the actual refund. However, because the tracking record had a falsified delivery time via the improper 'Stop the Clock' scan which was not corrected by management (a potential crime itself), customer service could not give the refund but referred Mr. Carr back to accounting services or asked Mr. Carr to start a new claim for a refund (which was not permitted at that time due to the delay).

41. There are now numerous documents which are false due to the original falsified delivery time and thousands of others as documented by USPS OIG, to include quality reports to Congress and the U.S. public, profitability reports for individual post offices and regions, and bonuses paid to management of said post offices and regions.  This is a prime example of how one uncorrected falsified document multiplies until it becomes hard to find any truthful and correct documents.

## Count 2

### USPS OIG Refuses to Investigate or Report Federal Crimes

42. The Plaintiffs repeat and re-allege paragraphs 1 through 41, as if fully set forth herein.

43. Mr. Carr visited the USPS OIG web hotline which stated "the USPS OIG Hotline CANNOT assist you with daily mail delivery and tracking problems" but also "the USPS OIG Hotline CAN assist you with ... Employee Misconduct".

44. Mr. Carr made several submissions to the Hotline which includes Submission 167800 on 18 May 2021, Submission 170675 on 27 May 2021, Submission 184761 on 19 July 2021, and Submission 209111 on 22 October 2021. However, even though he cited specific federal crimes of falsifying government records, defrauding postal customers and USPS management uniformly unable to make any corrections, in all cases the complaint was simply referred back to USPS local management and with no correction or action taken. However, each complaint was closed as successfully resolved even though no corrections or actions were taken.

45. On 1 August 2021 Mr. Carr wrote directly to the USPS Inspector General inquiring as to the origin of the policy preventing any USPS OIG investigation of certain crimes of falsifying government records, e.g. improper 'Stop the Clock' scans of packages as delivered prior to actual delivery and, amongst other things, defrauding postal customers.

46. This letter seems to have been referred back to the USPS OIG Hotline where they suggested that Mr. Carr would need to file a Freedom of Information Act request to get the information he required.

47. Mr. Carr submitted the FOIA request on 19 October 2021 and received a statement from Tanya Hefley stating "However, we were advised, during processing, the OIG Hotline determines the best routing (OIG, Inspection Service, Postal Service, other agency, etc.) for an allegation on a case-by-case basis."

48. A 2017 USPS OIG audit found there were over 1.9 million improper 'stop the clock' scans out of the 25.5 millions which were analyzed. The result was that over 7 percent of the analyzed scans were improper. Extending this to the over 4 billion scanned packages during 2017, as many as 280 million of such scans defrauded customers by these improper scans preventing 'guaranteed delivery' refunds. Further, the USPS OIG listed over about 1.4 million customer complaints in FY 2017 related to delivery.

49. In a 2020 Blog report by USPS OIG, "Specifically, 38 percent of the more than 1,100 packages that were selected at these units and that were in the facility before the carriers arrived for the day had been improperly scanned."

50. When Mr. Carr reported the details of  the falsified delivery time to OIG case workers, it was not only 'likely' that a federal crime had been committed, but,in light of USPS OIG reports

on the problem, it was 'beyond reasonable doubt.'

51. However, the reality is that improper 'Stop the Clock' scans are federal crimes and are not ever referred to the Attorney General as required by statute 5a USC IG Act 1978 Section 4.

52. On 1 August 2021 Mr. Carr wrote to the USPS IG directly complaining of an apparent illegal order preventing USPS OIG case workers from reporting known federal crimes (the well documented improper 'stop the clock scans' (a.k.a. falsified government records) to the Attorney General as required explicitly by the INSPECTOR GENERAL ACT OF 1978 which states in part that the 'Inspector General shall report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law'.

53. The USPS IG made no response but via U.S. Representative Marc Veasey, Ms. Kelly Delaney, Senior Attorney, Government Relations, USPS OIG, replied on 7 June 2022  in USPSoigRsps.pdf  (an electronic document already sent to the relevant Defendants) and stated

> The OIG conducts investigations to determine whether evidence exists of misconduct or criminal activity by postal employees and, when appropriate, refers such matters for criminal prosecution. When employee conduct does not meet the threshold for prosecution, we typically refer such matters to Postal Service management officials for their determination of possible administrative action. … We did not identify a violation that warranted referral for criminal prosecution.

54. Thus, the OIG is claiming the authority to decide which cases should be prosecuted while it is clear from 1978 IG Statute that Congress intended that the decision to prosecute is reserved solely for the Attorney General (or the DoJ realistically).

55. It is apparent that the USPS OIG has decided to allow the USPS to commit certain federal crimes with impunity thereby defrauding thousands of postal customers each year.

56. On 3 August 2022, Mr. Carr wrote to the USPS Board of Governors with USPSbdRqst.pdf (previously provided to relevant Defendants) complaining of apparent illegal orders preventing the USPS IG from properly reporting federal crimes to the DoJ as required by statute, possibly a crime itself of obstruction of justice.

57. There was no response from USPS BoG but on 14 Dec 2022 from Andrew Jones, USPS

Government Relations Representative replied via Representative Veasey with BrianCarr.USPSreply.12-12-22.pdf (previously provided to relevant Defendants) which states 'the Council of the Inspectors General on Integrity and Efficiency (CIGIE) is responsible for investigating complaints about an Inspector General. CIGIE conducts its investigations independently, and it has requested that all inquiries related to its functional responsibilities be referred to CIGIE for reply.' It claims that the complaint was forwarded to CIGIE but no response was forthcoming.

58. There are anecdotal reports of widespread falsification of records of all types within USPS which is the likely result of USPS OIG unlawfully granting USPS the ability to falsify delivery records with impunity.

## Count 3

### DoS Denies Mrs. Carr Visa without Due Process

59. The Plaintiffs repeat and re-allege paragraphs 1 through 58, as if fully set forth herein.

60. Mr. and Mrs. Carr had married on 23 June 2018 in Thailand and applied for an immigration visa via an I-130 petition submitted to USCIS on 17 July 2018.

61. However, they learned that the I-130 petition normally takes over a year to be processed. They were concerned that his mother was over 90 years old and her health was failing. It was unlikely that she would survive for more than a year. The couple wanted Mrs. Carr to be able to meet Mr. Carr's mother so they decided to apply for a non-immigration visa.

62. As a result, Mr. Carr completed the application for a non-immigration visa DS-160 for Mrs. Carr with the $160 fee paid by Mr. Carr with his American credit card.

63. Mr. Carr requested that he be permitted to attend the interview as Mrs. Carr representative as he was more familiar with his mom's health and his finances. However, he was told that was not possible due to security and space concerns at the consulate.

64. As an alternative, Mr. Carr completed an I-864 affidavit of support showing assets of $2,986,370.28 over 90% of which were in IRA accounts which could not be moved outside of the U.S. without complex and expensive tax implications. He also attached statements supporting those assets and an explanation that the couple had sufficient assets to live wherever they chose and that it would be incredibly stupid for them to overstay their visa as

it would preclude freedom to travel in the future.  They were not stupid people.

65. On 29 Aug 2018 Mrs. Carr had an interview for a B-1 / B-2 non immigrant visa (business / tourist) at the Chiang Mai Consulate in Thailand with appointment AA00843QZW.

66. The interviewer did not review any of the papers which Mr. Carr had prepared but instead did a cursory review of Mrs. Carr visa application record and noted the I-130 application to immigrate.  The interviewer then informed Mrs. Carr that she could not get a tourist visa because she had an outstanding immigration visa application.  The only way she could get a tourist visa would be to rescind her immigration application first and then reapply for a tourist visa.  This deeply upset Mrs. Carr, presenting her with a sort of Sophie's choice dilemma. Needless to say, the interviewer's verbal claim was totally contrary to the published requirements and the law in these matters.

67. The actual denial letter had no references to any evidence presented or reviewed but simply cited section 214(b) [of the INA] and 'you did not overcome the presumption of immigrant intent, required by law, by sufficiently demonstrating that you have strong ties to your home country that will compel you to leave the United States at the end of your temporary stay'.

68. Mr. and Mrs. Carr were unlawfully denied their ability to travel freely due to denial of Mrs. Carr's visa application.

69. Mr. Carr complained to the DoS OIG with complaint H20190052 citing the lack of due process through the denial of the right to representation (Mr. Carr could not attend the interview), the denial of the opportunity for Mrs. Carr to present evidence, and the denial of the right to a written decision based solely on the law and evidence presented.  Mr. Carr explained that the requirement that Mrs. Carr rescind her immigration application was not supported by the law and, as such. was unlawful.

70. On 10 October 2018 received a response via the DoS OIG in the form of a PDF file which

71. has been named DoSig2018rsps.pdf signed by Cristin Heinbeck, Outreach and Inquiries Division, Visa Services of DoS which stated in part:

> there is no provision in U.S. law that specifically precludes issuance of a
> nonimmigrant visa to an applicant with a pending immigrant visa case. However,
> such an applicant must still demonstrate that he or she has clear ties to a
> continuing life overseas and evidence that he or she intends only a temporary visit
> to the United States. Such evidence is required to overcome the provisions of

section 214(b) of the INA.

72. The DoS did not address the denial of the right to representation and the right to present evidence. Of course an applicant will not be able to overcome the provisions of section 214(b) if they are not permitted to present the evidence which is required by section 214(b).

73. As DoS OIG improperly abdicated its responsibility to oversee BCA and referred these serious violations of the Fifth Amendment rights of Due Process to BCA, Mr. Carr continued his efforts a just and lawful decision by writing several emails to the Chiang Mai Consulate General.

74. Mr. Carr was able to persuade USCIS to expedite the I-130 immigration petition process and it was approved within four months (likely a record for such petitions in Thailand at that time).

75. Mr. and Mrs. Carr were also subjected to unwarranted stress in getting the I-130 so quickly as was the staff at USCIS who had to deal with the constant concerns raised by Mr. Carr about every delay.

76. Mrs. Carr was able to meet Mr. Carr's mother and that was a source of joy for all parties. Mr. Carr's mother died within a week of their arrival so the desire to visit promptly was well founded.

77. Mr. and Mrs. Carr returned to Thailand after a roughly three month visit to the United States (so would not have 'overstayed' a tourist visa in any case).

78. However, four years later USCIS failed in meeting its statutory mandate to allow Mrs. Carr to work and travel freely and left Mrs. Carr stranded in Thailand, unable to return to the U.S..

79. As a result, Mrs. Carr had to make a second application for a tourist visa with DoS BCA with the interview on 12 Dec 2022 at the Chiang Mai Consulate with appointment AA00BCSFIT.

80. Mr. Carr sent an explanatory email to the Chiang Mai Consulate General citing the previous letter from DoS stating that Mrs. Carr's previous visa application was denied unlawfully and explaining that USCIS had unlawfully left Mrs. Carr stranded in Thailand, attaching the supporting documents for this conclusion. Mr. Carr asked that an adequately trained interviewer be assigned to review Mrs. Carr's visa application so that there would not be further unjust and unlawful decisions.

81. The Consulate General responded that all interviewers were properly trained and made their decisions independently of any input from the Consulate General but it is possible that an addendum was made to Mrs. Carr's file explaining the sensitivity of the application.

82. Mrs. Carr's second visa application was approved with no substantial input from Mrs. Carr, only an online review of the status of the application.

83. The cost of this second visa application fee was $160 which Mr. Carr attributes half to USCIS for leaving Mrs. Carr stranded in Thailand and half to DoS BCA for unlawfully denying the first visa application.

### Count 4

### DoS Denies Mrs. Von Kramer Visa without Due Process

84. The Plaintiffs repeat and re-allege paragraphs 1 through 83, as if fully set forth herein.

85. Mrs. Von Kramer is the widow of an American veteran who died on 26 April 2014 (born 19 Nov 1944). Mrs. Von Kramer had promptly notified the U.S. embassy and Social Security of his death.

86. A member of the embassy staff had kindly mentioned to Mrs. Von Kramer that if she visited the U.S. regularly she could get survivor benefits from Social Security. She also explained that if Mrs. Von Kramer did not have friends or family in the U.S. it would be prohibitively expensive and not really possible.

87. As a result, after Mrs. Carr (her sister) had become a Permanent Resident of the U.S., Mrs. Von Kramer's younger daughter Yui Montira Moongram submitted a DS-160 visa application for Mrs. Von Kramer and paid the $160 fee. Her first interview was held on 9 Sep 2019 at the Chiang Mai consulate.

88. Mrs. Von Kramer asked that Mr. Carr attend the interview. Mr. Carr inquired again and was told that only the applicant was permitted in the consulate due to security and space constraints.

89. Mr. Carr helped Mrs. Von Kramer prepare an extensive folder of papers (more than an inch thick) to demonstrate her financial resources and ties to Thailand. It started with dual affirmations for Mr. Carr and Mrs. Von Kramer (affirmed under penalty of perjury) with descriptions of the other 'exhibits' which included:

   ○ Round trip tickets to the U.S. with the first flight on 13 Oct 2019 on the same flight to the

U.S. as Mr. and Mrs. Carr were taking and return flights for Mrs. Von Kramer after a 14 day stay (longer than the 1 day minimum requirement and shorter than the 30 day / full month maximum for a 'lawful presence' visit as described in the affirmations).

- An email from Mr. Carr inviting Mrs. Von Kramer to stay at their house during her visit to the U.S..

- Previously Mr. Carr had provided Mrs. Von Kramer with a statement from one of Mr. Carr's retirement accounts showing over $400,000 in assets (signed by Mr. Carr), but as this ran to over ten pages it was decided to not include it in the packet and rely on the substantial savings Mrs. Von Kramer demonstrated below. Instead the focus would be on the accommodations and opportunities for service and volunteering and other 'lawful presence' activities described in attachments to the invitation email

- A signed copy of Mr. Carr's passport ID page.

- A Thai bank statement showing a roughly $30,000 balance in Mrs. Von Kramer's name for the last six months (and certified at the bank).

- Deeds to Mrs. Von Kramer's houses in Chiang Mai and Chiang Rai with pictures of the houses (they are nice houses) along with her and her dogs, two daughters, and other sister and brother (in different pictures).

- Deeds to some of her farm land (prime rice paddies in Chiang Rai where Mrs. Von Kramer was born).

- Title to her car along with pictures of her with the car and family members.

- University diplomas for her two daughters.

- Documentation of her daughters' long term employment as a nurse in Chiang Mai and Network Engineer in Bangkok together with pay stubs.

- Documentation of her marriage to Mr. Von Kramer and his death.

- An explanation by Mr. Carr of the requirements to get social security survivors' benefits which include several 'lawful' visits to the U.S. over a five year period (and a stipulation that any overstays would disqualify her from any future benefits).

First Visa Application Denied

90. Surprisingly enough, the interviewer verbally denied Mrs. Von Kramer first visa application based on her not having firm travel plans. This was not based on any evidence as Mrs. Von Kramer had copies of her flight tickets and invitation as described above.

91. Further, the written denial letter was identical to the one Mrs. Carr had received with no references to any evidence presented or reviewed but simply cited section 214(b) and 'you did not overcome the presumption of immigrant intent, required by law, by sufficiently demonstrating that you have strong ties to your home country that will compel you to leave the United States at the end of your temporary stay'.

92. Mrs. Von Kramer apologized to Mr. Carr at the end of the interview for not presenting her case well, but the real problem was the denial of her right to Due Process and representation.

93. Mrs. Von Kramer was raised in a very poor family with nine children and a sharecropper father.  She had a limited education of only four years before she needed to start working to help support the family.

94. As a girl from a poor family in Thailand she was taught to be polite and not speak out.  She was not taught how to persuasively and clearly advocate for her position.  However, Due Process is guaranteed to all persons who deal with the U.S. government and the right to representation is to insure that justice is not provided only to the rich and well educated.

Second Visa Application Denied

95. Mr. Carr completed a second DS-160 visa application for Mrs. Von Kramer with the interview on 30 Sep 2019 at the Chiang Mai Consulate (appointment AA009APPX1) and Mrs. Von Kramer paid the roughly $160 fee in Thai Baht.

96. Mrs. Von Kramer was able to mention to the interviewer that she wanted to apply for Social Security but the interviewer falsely claimed that she could have her social security claims handled in Manila in the Philippines and did not need a U.S. visa for that.  It is unclear if the interviewer was ignorant of Social Security rules and regulation or maliciously told her false information.

97. Mrs. Von Kramer mentioned her contact at the embassy who had explained the U.S. requirements for non citizens to receive Social Security benefits overseas to Mrs. Von Kramer, but the interviewer declined to call her.

98. The interviewer also did not read Mr. Carr's extensive explanation of Social Security rules and regulations applicable to Mrs. Von Kramer but instead denied her application based on the false claim that she could get her social security benefits in the Philippines.

99. The written denial letter was the same form letter as before with no mention of the actual evidence considered.

Third Visa Application Denied

100. Mrs. Von Kramer again apologized to Mr. Carr for not presenting her case well as she had not given the interviewer the extensive documentation which Mr. Carr had compiled.

101. Mr. Carr completed a third DS-160 visa application for Mrs. Von Kramer with the interview on 9 Oct 2019 at the Chiang Mai Consulate (appointment AA009BKKHR) and Mrs. Von Kramer paid the roughly $160 fee in Thai Baht.

102. Before the interview, Mrs. Von Kramer practiced handing the packet of documentation to the interviewer as she had not done that in previous interviews.  Mr. Carr also ensured that she called attention to his affirmation which explained all the other attachments as well as the requirements for Social Security benefits paid to foreign nationals overseas.

103. In the actual interview, Mrs. Von Kramer did hand the packet to the interviewer and he did spend a few seconds reading the first few pages, before closing the packet and informing Mrs. Von Kramer that she could not get a visa as she was a widow and too old with insufficient ties to Thailand.  If she were to remarry she could reapply and might be eligible for a visa.

104. Of course this verbal rationale is completely contrary to the published rules and laws for non-immigration visas.

105. The written denial letter was the same form letter as before with no mention of the actual evidence considered.

106. It should be noted that if Mrs. Von Kramer were to remarry, she would no longer be eligible for SSA survivors' benefits, the central focus of the first few pages of Mr. Carr's affirmation.

107. It is also apparent that the DoS BCA has unpublished unwritten unlawful policies which are followed by interviewers such as:

○    Immigration applicants should not be granted tourist visas irrelevant of the actual facts and circumstances.

○    Widows of deceased American citizens (or more properly surviving spouses) should never be granted tourist / business visas irrelevant of the actual facts and circumstances

The last item may be intended to reduce drains on the overburdened social security system which could be considered an admirable goal, but it is up to Congress to balance the complex trade offs of such matters.

108. Mrs. Von Kramer suffered financial loss due to these unlawful denials of visa applications to

include three application fees ($160 times 3, or $480) but also the flight tickets she was not able to use.  Her round trip fare via Expedia on China Southern Airlines was $511.53 which was a bargain for non-refundable tickets, but Expedia was helpful in negotiating with China Southern Airlines due to the extenuating circumstances and was able to get a refund of the entire amount less the stated change fee of $134.

109. Mrs. Von Kramer was also unable to establish a lawful presence in the United States during the years of 2019, 2020, and 2021 according to SSA policies concerning payments to non-citizens residing outside the United States.

### Fourth Visa Application Approved

110. Mrs. Von Kramer made a fourth application for a tourist visa with DoS BCA with the interview on 12 Dec 2022 at the Chiang Mai Consulate with appointment AA00BCSFIT.

111. Mrs. Van Kramer was able to schedule her interview to be 15 minutes after Mrs. Carr time slot so that the two sisters went in together.  It happened that Mrs. Carr was able to introduce Mrs. Von Kramer to Mrs. Von Kramer's interviewer with the statement 'She is my sister' before Mrs. Carr went on to her interview.

112. Mrs. Von Kramer was prepared with a more extensive folder of papers and had practiced presenting the papers with simple and brief explanations (e.g. "Here is an invitation letter from my brother-in-law, here is a picture of me with my sister and brother-in-law, here is a copy of my brother-in-law's passport page which he has signed for me, …")

113. However, before Mrs. Von Kramer could start her presentation, the interviewer asked if she would be traveling with others.  She answered that she would be traveling with her sister and brother-in-law and the interviewer replied 'Let me look into the status of the other members of your group'.  He then briefly looked at records on his computer before telling Mrs. Von Kramer that her visa application was approved.

114. It is possible that Mrs. Von Kramer's interviewer may have read any notes or concerns about Mrs. Carr's visa application made by the Chiang Mai Consulate General in response to Mr. Carr's previous email.

### SSA Conditionally Grants Survivors' Benefits

115. As a result, Mrs. Von Kramer was able to visit the United States briefly in 2022 and 2023, possibly establishing a lawful presence for those years according to SSA standards.  See SSA POM RS 02610.025 5-Year Residency Requirement for Alien Dependents/Survivors

Outside the United States (U.S.)

116. After a weekend trip to Cancun Mexico in January of 2023, Mrs. Von Kramer continued the process of applying for SSA survivors' benefits which started in May of 2023 and have continued with the requirement that Mrs. Von Kramer can not continue to receive benefits outside the U.S. if she is outside the U.S. for more than six months.

117. Mrs. Von Kramer has met SSA's requirements for payments and intends to continue her regular visits to the U.S. until SSA determines that she has established a lawful presence in the U.S. for five years.

DoS Refuses FOIA Requests

118. On 11 May 2023  via the DoS FOIA request web page Mr. Carr submitted two FOIA requests along with emails to FOIARequest@state.gov with required release forms for Mrs. Von Kramer and Mrs. Carr seeking all records related to the visa applications cited herein..

119. On 24 July 2023 responding to Case Number: F-2023-08493 Laura Stein, Deputy Director, Office of Domestic Operations, Directorate for Visa Services (DoS) stated that even with authorizations for release of FOIA information from Mrs. Carr and Mrs. Von Kramer, the DoS would still be required by section 222(f) of the Immigration and Nationality Act (8 US section 1202(f)) to keep confidential any visa records that were not previously received from or sent to the subject of the request.

120. This misconstrues 8 US section 1202(f) which states:

> (f) Confidential nature of records shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States,

121. However, the Fifth Amendment guarantees to all persons (including foreign nationals) the right to Due Process which certainly includes access to all the evidence presented against them.  All such information must be released to the applicant in order to administer the immigration laws and the applicants' due process rights so 222(f) does not apply to applicants seeking access to records applicable to their case.

122. These requirements on administrative procedures even extend to properly classified information covered by the Classified Information Procedures Act (CIPA) which provides uniform procedures for prosecutions involving classified information.

123. In Kiareldeen v. Reno, see 71 F.Supp.2d 402, the court ruled in favor of an immigrant

applicant facing deportation.  On appeal, the court ruled that the reliance on secret evidence violated his due process rights because (1) it deprived him of meaningful notice and an opportunity to confront the evidence against him, and (2) exclusively hearsay evidence could not be tested for reliability.

### Count 5

### DoS OIG Refuses to Investigate or Report Federal Crimes

124. The Plaintiffs repeat and re-allege paragraphs 1 through 123, as if fully set forth herein.

125. In early October 2018 Mr. Carr submitted a complaint via the DoS OIG hotline (a web page) concerning malfeasance in the processing of visa applications as the DoS BCA did not provide due process, particularly the right to representation, lack of a written decision based on the evidence and the law, and right to appeal.

126. On 10 October 2018 he was assigned reference number H20190052 and a response which included 'We have reviewed your complaint and determined that the appropriate office to address your concerns is the Bureau of Consular Affairs, Executive Office. Your information has been forwarded to that office.'

127. This was consistent with The DoS OIG hotline web page at https://www.stateoig.gov/hotline which states 'Please note: OIG does not investigate complaints about the denial of U.S. visas.'

128. In April of 2023 Mr. Carr again complained about the lack of due process in processing visa applications and received the same response (apparently a form email) with H20231749 on 20 April 2023 for Mrs. Carr and H20231753 on 18 April 2023 for Mrs. Von Kramer.

129. However, in the 2023 complaints Mr. Carr explicitly made a plausible allegation of falsifying government records (a federal crime) from omitting required information from the denial notices as required by Due Process. Specifically there was no reference to any of the actual evidence presented or considered.

130. The right to a written decision well founded on the evidence is particularly important (perhaps the foundation of due process) and 18 U.S. Code Section 1001 defines a federal crime (falsification of government records) as:

> (a) ... whoever, in any matter within the jurisdiction of the executive... branch of the Government of the United States, knowingly and willfully --

(1) falsifies, conceals, or covers up ... a material fact;

131. This has been held to include the omission of required facts which would include the rationale for a particular visa denial.  It would also include having contradictory records, e.g. the video recording which included absurd conclusions such as that Mrs. Carr could not receive a non-immigration visa while she had an outstanding immigration application and a written decision which has no explanation at all.

132. Mr. Carr asked that the matter be forwarded to the DoJ as DoS OIG was required to report all plausible allegations of federal crimes to the Attorney General by statute, i.e. the INSPECTOR GENERAL ACT OF 1978 which states in part that the 'Inspector General shall report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law'

133. Mr. Carr explained that if the DoS OIG did not have sufficient resources to investigate every plausible allegation of a federal crime, it was acceptable to forward the complaints to another department for resolution (perhaps even local management) as long as the complaint was also forwarded to the DoJ.

134. Further, on 20 June 2023, Mr. Carr reported this malfeasance and, potentially, obstruction of justice within the DoS OIG to the DoS IG, Secretary Blinken (DoS), and CIGIE.

### Count 6
### CIGIE Takes No Action to Insure Lawful IG Compliance

135. The Plaintiffs repeat and re-allege paragraphs 1 through 135, as if fully set forth herein.

136. On 20 June 2023, Mr. Carr complained to the CIGIE about DoS IG not reporting federal crimes to the DoJ as required by statute.

137. On 9 August 2023 the CIGIE responded that it was closing the case IC23-083 with no action taken (a standard form letter email with no reference other than the date of complaint and case number).

138. On 9 Oct 2023, Mr. Carr complained to the CIGIE about USPS IG not reporting federal crimes to the DoJ as required by statute.

139. On 1 Nov 2023 the CIGIE responded that it was closing the case IC24-010 with no action taken (a standard form letter email with no reference other than the date of complaint and case number).

140.46Mr. Carr was seeking that the council abide by its charter and insure that all Inspector Generals (IG) and staff under the different IGs are aware of the requirement to report all federal crimes to the Attorney General (AG) or, logically, the Department of Justice (DoJ), whenever they believe a federal crime has been committed within their purview / department(s) which they monitor.  See the INSPECTOR GENERAL ACT OF 1978, Section 4, which states in part that the "Inspector General shall report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law."

141. It appears the United States Postal Service (USPS), Department of State (DoS) and Department of Homeland Security (DHS) IG's have each decided that they can choose not to prosecute certain federal crimes, particularly those crimes which have been integrated into the monitored departments normal procedures and which would be greatly disruptive to the monitored department to correct.  They do this by refusing to report these crimes to the DoJ.

142. However, just because criminally illegal processes are integrated into the monitored department does not make them immune from prosecution.  The decision to prosecute resides solely with the DoJ and failure of the IG to report federal crimes is at least malfeasance and could be construed to be obstruction of justice (another federal crime).

143. Mr. Carr was not asking for prosecution of any crime but only a directive from the CIGIE that all OIG personnel report all plausible allegations of federal crimes to DoJ even if they do not have sufficient resources to investigate the allegation and can not confirm that the crime is likely, much less prosecutable.

144. Further, it appears that the CIIGE has gone from a council which was intended to develop and enforce the highest standards adherence to the law to instead become a group that supports and encourages criminal behavior in their monitored departments and shares ideas and methods for supporting the criminal behavior.  This could be construed as going beyond simple obstruction of justice to violating federal RICO criminal statutes, e.g. collusion between the illegal orders of the USPS BoG, USPS senior management, USPS IG, and CIGIE.

18 USC § 1505 - Obstructions of proceedings (OIG Case)

18 USC § 1510 - Obstruction of criminal investigations

Bribery to prevent communication with investigator

18 USC § 201 - Bribery of public officials and witnesses

Illegal order to OIG case worker to not report federal crimes to DoJ,

Case worker (or IG) gets to keep job if they do not report federal crimes to DoJ

18 USC Ch 96 (RICO) -

145. Of course Mr. Carr is not arguing that the RICO charges would be prosecutable or even recommending / asking the DoJ to prosecute any party, only that DoJ insures that all agencies of U.S. government endeavor to obey all lawful statutes to include reporting all plausible allegations of federal crimes to the DoJ.

**Count 7**

**USCIS Denies Citizenship After Approval**

Initial Applications

146. The Plaintiffs repeat and re-allege paragraphs 1 through 145, as if fully set forth herein.

147. On 04 Aug 2020, USCIS received Mrs. Carr's I-751 application for a permanent green card (remove two year conditions) with receipt MSC2091582908.  However, there was no interview with Mrs. Carr receiving an 18 month extension letter and later a 24 month extension letter (thus extending the original expiration of her 'green card' from 13 Nov 2020 to 13 Nov 2022).  This delay in scheduling the I-751 interview is a direct violation of 8 CFR Section 216.4(b)(1) which states:

… The director must either waive the requirement for an interview and adjudicate the petition or arrange for an interview within 90 days of the date on which the petition was properly filed.

148. On July 11, 2022, Mrs. Carr submitted her N-400 application for naturalization as USCIS timetables suggested her I-751 interview was imminent and there was a 9 month delay for N-400 interviews.  This would allow her to complete her I-751 interview and get her permanent green card about six months before her N-400 interview.  This would allow time for her to study for the English and civics exams without concerns about having an expired green card.

Mrs. Carr's emphatic desire for a permanent green card before citizenship

149. It is important to understand that Mrs. Carr was absolutely terrified of USCIS.  As an older immigrant from a poor family with extremely limited education, only 4 years of schooling, and no formal exposure to English in her childhood, Mrs. Carr feared arbitrary, capricious and unjust actions by USCIS such as deporting her without cause or notice if she failed her citizenship test or leaving her stranded overseas, not able to return to the U.S..

150. Mr. Carr also came from a relatively poor family, but he was born in the U.S. and was very fortunate.  Mr. Carr graduated from West Point and later received a graduate degree from M.I.T..  Mr. Carr could not believe that USCIS would take unlawful and illegal actions such as leaving Mrs. Carr stranded overseas unable to return to the U.S..  It turns out in retrospect that Mrs. Carr was more correct than Mr. Carr.

Unlawful Restrictions on Travel by USCIS, Stranded in Thailand

151. In September of 2022, Mrs. Carr returned to Thailand on an emergency basis as her mother's health was failing.  Sadly Mrs. Carr arrived just after her mother's death but was able to participate in the funeral ceremonies which extended until December of 2022 as Thai traditions has the ashes from the cremation waiting 100 days before being taken back by the family.

152. Her green card and extensions expired on 13 Nov 2023 while Mrs. Carr was in Thailand on an emergency basis.  Even though 8 CFR Section 216.4 states ... 'Upon receipt of a properly filed Form I-751, the alien's conditional permanent resident status shall be extended automatically, if necessary, until such time as the director [of USCIS] has adjudicated the petition.', USCIS refused to provide Mrs. Carr with any documentation to allow her return to the United States.  This is contrary to the above statute.

153. USCIS's suggestion for how Mrs. Carr was to return to the US was via an I-131A (for travelers who have 'lost' their documents to get a one time document allowing their return for a $575 fee).  Instead Mrs. Carr got a $160 multiple entry B1 / B2, business / tourist visa and was able to return to the USA in late Dec 2022.

Rescheduling Original Interview

154. Further, USCIS scheduled Mrs. Carr's N-400 interview for 14 Dec 2022.  Mr. Carr explained to USCIS that Mrs. Carr would be unable to attend as she was out of the country and could not return due to USCIS's refusal to provide her with proof of valid permanent resident

status.  On 21 Nov 2022 USCIS canceled the 14 Dec 2022 interview and later scheduled her joint interview for I-751 and N-400 for 30 Jan 2023.

A-551 Passport Stamp Instead of Green Card

155. Mrs. Carr was also able to come into a USCIS office on 3 Jan 2023 to get an A-551 stamp in her passport which was valid for one year but does not provide the full ability to travel and work freely of a traditional green card.

Improper Application of English Requirement to Older and Poor,<br>Discriminates Against Buddhist and Islamic Cultures

156. Prior to the interview on 30 January 2032, Mr Carr initiated a complaint with the DHS OIG that the English requirements for naturalization were discriminatory based on religion, income, age and culture.

157. It is well established that the appropriate time to learn the sounds of English is soon after birth.  Further the appropriate time to learn to recognize the shapes of English characters is before adolescence.

158. For example, in Thai language there is no 'th' sound. Further, the pair of plosive sounds d and t are not in the Thai language. The Thai language includes only the consonant that is between d and t. As an adult Mr Carr cannot hear the sound that is between d and t nor can he pronounce it.  Similarly, because Mrs. Carr was not exposed to English at an early age, she is unable to hear or pronounce the 'th' sound.

159. Similarly, the time to learn to recognize the characters of the English alphabet is before adolescence. While it is possible to learn to recognize a foreign alphabet at later years, the recognition will never be as quick, accurate or comfortable as if it was learned before adolescence.

160. The actual effect of the English requirement for citizenship is to discriminate against older individuals from poor families from Buddhist and Islamic countries.

Joint I-751 and N-400 Interview of 30 Jan 2023

161. There was a joint I-751 and N-400 application on 30 Jan 2023.  The informal results were that Mrs. Carr failed the English and civics tests.  The interviewer also canceled the 'final' portion of the I-751 interview which was an undocumented and possibly unlawful review of the 'criminal background' questions from some previous forms (not part of the I-751

application itself) as Mrs. Carr did not understand English and so could not personally answer those questions.

162. The results of the interview were given verbally and informally at the time of the interview. There was also a poorly written and ambiguous form letter with check boxes concerning the N-400 results.

163. However, the next day (31 Jan 2023) USCIS entered a formal written decision for the I-751 application (previously provided to relevant Defendants as I797forMSC2091582908-ioe9752855294.pdf.) which stated in part:

> We have approved your I-751, Petition to Remove Conditions on Residence. Our records also indicate we have approved your Form N-400 Application for Naturalization. Because we also approved your N-400, you will not receive a new Permanent Resident Card (also known as a Green Card). Instead, once you have taken the Oath of Allegiance, you will receive a Certificate of Naturalization, which will be proof of your U.S. citizenship. If you have questions regarding this process, please contact the USCIS contact center at 800-375-5283.

164. Mr. and Mrs. Carr were elated at this change in fortune as it was a complete reversal of the informal verbal results. They relied on the formal written decision as a final findings of facts, decision, and order (to borrow from judicial terminology which is appropriate for a serious due process matter concerning the ability to vote and work and travel freely).

### USCIS Denied I-751 Through False Statements

165. Within a couple of weeks Mr. and Mrs. Carr inquired at the specified contact number as to when the Oath of Allegiance would be scheduled and were told that the normal processing time for such matters was 4 or 5 months and that they should call back after that.

166. Mr. and Mrs. Carr would later learn that her I-751 was actually denied (no green card would ever be issued on that application based on the statement that Mrs. Carr's N-400 was approved). As more than thirty days have passed since this effective denial based on statements which USCIS believed to be false, there are no avenues within USCIS to actually get the permanent green card.

### USCIS Unlawful Policies Justified as 'Enforcement'

167. The US government has had a long history of discriminating against foreign nationals with

USCIS and its counterpart for visas in the Department of State each contributing through an unlawful disregard for due process.

168. However, during the Trump era with the appointment of Director Francis Cissna, confirmed 5 Oct 2017, USCIS went to new heights of illegally mistreating foreign nationals.

169. Specifically, USCIS stopped waiving of the interview for an I-751 application even though these waivers were mandatory in accordance with 8 CFR Section 216.4 (b) which states:

> "The director must either waive the requirement for an interview and adjudicate the petition or arrange for an interview within 90 days of the date on which the petition was properly filed."

The unlawful elimination of waivers (previously about 90% had been waived) created an explosion in the unlawful queue for I-7171 interviews for USCIS which already had an illegal 1-year backlog of applications. Further, the interviewer was now required to verbally confirm the prior criminal background questions.

170. As most I-751 applicants do not speak English and most USCIS interviewers speak only English, USCIS effectively stopped conducting interviews for I-751 applications. Instead of adding more resources to conduct the expanded interviews with the collected fees, USCIS just illegally stopped conducting interviews which, along with the illegal termination of the mandated waivers, added to the explosion of the illegal queue for I-751 interviews. Executive Discretion gives wide latitude to the executive branch but this does not extend to explicitly prohibited behavior when there are legal options available such as using the collected fees for their specified purpose of granting waivers and conducting interviews. As cited above, USCIS was explicitly required to grant a waiver or schedule the interview and adjudicate the I-751 within 90 days of the acceptance date of the I-751 in 8 CFR Section 216.4(b)(1).

171. Instead USCIS simply waited until the applicant later filed an N-400 application for citizenship, though not all applicants later filed N-400 applications. Then the interviews were combined with the verbal review of the criminal background questions conducted in English, assuming the applicant was able to pass the English test. Further, the criminal background questions were already part of the N-400 interview in any case.

172. However, if the applicant was unable to pass the English test, then USCIS was in a bind for the I-751 new criminal background portion of the joint interview. USCIS had to find a creative solution to process this case.

173. It appears that USCIS chose to effectively deny the I-751 application by claiming it was approved along with the N-400 so that no permanent resident card was provided. However, USCIS would then refuse to provide either a permanent resident card or certificate of naturalization by later claiming in future case updates that the N-400 application had not been approved.

174. This meets the criteria of a federal crime because the effective denial of the I-751 application was based on a claim that USCIS believed was false. For future reference, this will be called 'effective denial based on false premises'.

USCIS Provides Incomplete or False Estimates of Interview Dates

175. When USCIS effectively ceased providing separate I-751 interviews, they did not provide notice to applicants nor did they provide accurate estimates for the dates when interviews would be scheduled. The actual scheduling of I-751 interviews was never unless the applicant submitted an N-400 application (citizenship) in which case both interviews were scheduled together almost immediately irrelevant of the normal queue for N-400 interviews.

176. This caused great uncertainty and fear for those applicants who were poorly educated with limited English ability and poor understanding of US government procedures such as Mrs. Carr.

177. The phone number provided by USCIS for questions and concerns was answered by an automated phone system which was distinctly unresponsive and would routinely hang up on applicants if they were not able to correctly formulate a request or question which the automated could respond to.

178. For most of the time when the I-751 application was pending scheduling an interview (and in a queue over two years long and growing), there were no requests or questions which the automated system could respond to. It was certain that the automated system would hang up on the applicant after about five minutes of struggling to find a way to speak to an actual person where they could explain their concern. This phone number was the only point of

contact for applicants attempting to get information about the status of their application.

## Criminal Background Questions Unlawful

179. Just after the interview of 30 January 2023, Mr Carr also initiated an IG complaint concerning the criminal background questions which were routinely included as part of the USCIS application policy.

180. In particular, there are no exceptions provided about classified information which cannot be released to the interviewer or records sealed by a lawful court order.

181. Further, it is overly broad to not restrict the questions to actual convictions for serious crimes. As stated the questions would include every minor traffic or even parking violation in the state of Texas where such violations are considered crimes. The truth is, no one remembers all the situations where they may have gone over the speed limit or parked a few inches too close or too far from the curb.

182. In fact, the only accurate answer to any of the criminal background questions is 'yes' with an explanation of 'I can neither affirm nor deny the existence of information relating to this question.'. Any other answer could risk violations of the law by providing either classified or sealed information. Further, no one remembers or even knows all the circumstances where they may have violated some minor traffic, parking, or zoning regulation.

## USCIS Informed of Upcoming Travel Plans

183. In August, Mr. and Mrs. Carr contacted USCIS about scheduling a new A-551 stamp for Mrs. Carr's passport to preserve her limited ability to work and travel based on their travel plans to be out of the country from 10 Oct 2023 to 25 Dec 2023. They were told that they could not get a replacement A-551 stamp as they can only be issued within 30 days of expiration and the applicant must be in the US to get the stamp.

184. In August Mr. Carr also contacted his congressman, Representative Veasey, seeking assistance in getting the Oath of Allegiance scheduled as no action had been taken in the matter.

## N-400 Interview of 30 Jan 2023 Canceled

185. However, on 01 Sep 2023 USCIS sent a notice (USCIScancel20230901-20230130.pdf previously provided to relevant Defendants) which states that "the interview of 30 Jan 2023 was canceled due to unforeseen circumstances" (sent under the N-400 receipt). Of course

this is a completely false document (and hence a federal crime) as the N-400 interview was completed and this document contradicts several previous documents and verbal statements as well as the final decision in the I-751 case and later activity in the N-400 case.

186. On 5 Sep 2023 Mr. Carr and Mrs. Carr called USCIS at the prescribed number and spoke with Destiny, ID G010590.

They asked that Destiny send an email to the appropriate party to promptly schedule Mrs. Carr's Oath of Allegiance as stated in the cited I-751 approval notice and, in the alternative, if an N-400 was not actually approved, that Mrs. Carr be sent a new 10 year Permanent Resident Card.

Destiny explained that it is not uncommon for additional interviews to be required even after the I-751 and N-400 are approved and that Mrs. Carr could not be sent the approved Permanent Resident card.  Implicitly her statement indicates that such formal approvals were actually effective denials based on false premises.

At that time Mr. Carr asked that Destiny take notes for details to include in the email she would send on their behalf.

Mr. Carr cited 18 U.S. Code Section 1001 which is one of many criminal codes for falsification of government records and states in part:

 (a) ... whoever, in any matter within the jurisdiction of the executive... branch of the Government of the United States, knowingly and willfully --

   (1) falsifies, conceals, or covers up ... a material fact; ... or

   (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

   shall be fined under this title, imprisoned not more than 5 years

(3) prohibits taking any action based on a false document with the implicit exceptions that actions may be taken to: correct the false document or, if the individual is not authorized to correct the false document, to report the false document to their supervisor

and / or the relevant OIG explaining that there is an existing false document and a possible federal crime when the document was created.

### N-400 Interview Scheduled for 11 Oct 2023, Insufficient Notice

187. On 06 Sep 2023 USCIS scheduled an interview for 11 Oct 2023 as shown in UscisI797intrvw20231011.pdf (document previously provided to relevant Defendants), but the actual notice was not received until 15 Sep 2023 when it as too late to respond until the next week as Mrs. Carr works Tuesday to Sunday and is not able to respond while she is working.

188. The arrival date of this notice is a critical issue as there must have been timely notice of the interview in order to justify the denial of the N-400 application for failure to appear.  In USCISuspsMailArrivals20230915.pdf  (previously provided to relevant Defendants) is an email from USPS which shows the mail which arrived at their address on 15 Sep 2023.  The notice of 06 Sep 2023 seems to have been mailed on 12 Sep 2023 according to the postmark shown in the USPS email.  As 30 days notice is required for such interviews, the notice on 15 Sep 2023 was not timely for an 11 Oct 2023 interview and the denial of the N-400 application for failure to appear must be overturned due to lack of notice.

189. In the contested decision there is no claim of any notice at all and it appears that USCIS routinely delays mailing documents a few days after the date of the 'notice'.  In cases of mailed documents they adjust the 30 days to 33 days to allow for time in the mail, but there is no adjustment for delay in printing and actually mailing the notice.  Given that this document took 9 days to arrive, a more realistic adjustment for mailing would be 45 days if mailed without the normal proof of mailing.

### Complaint of Falsified Records, 01 Sep 2023 Cancellation

190. On 10 Sep 2023, Mr. Carr contacted the USCIS director and DHS IG reporting the contradictory records (was the interview held on 30 Jan 2023 which approved the I-751 and N-400 or was it canceled with no results).  With contradictory records, one or more of them must be false, the foundation of the federal crime of falsification of government records.

191. Mr. Carr  also asked for acknowledgement of the report within 7 days.  No such acknowledgement has been received to date.

192. On 07 Oct 2023, Mr. Carr asked that DoJ assist in correcting these serious defects in USCIS

and DHS IG.  The reports of the crime and request for assistance have previously been provided to relevant Defendants. (Note: Mr. Carr was unaware of the scheduling of the interview for 11 Oct 2021 on 06 Sep 2023 when he first reported the crime).

193. On 12 Sep 2023 Mr. and Mrs. Carr called USCIS at the prescribed number and spoke with Umika, ID  G20028112.

> They complained of the 1 Sep 2023 I-797 Notice of the canceling of the 30 Jan 2023 N-400 interview due to unforeseen circumstances (described previously).  They explained that the interview was held on that date and the 01 Sep 2023 document is a false record (and federal crime) which also contradicts the I-751 final decision of 31 Jan 2023 which stated that the N-400 application was approved at that interview. They advised Umika that she must either correct the false record or, if she did not have the authority to correct the record, she must contact either her supervisor or the IG or both to report the crime.  Failure to do so on her part would itself be a crime under 18 U.S. Code Section 1001, part 3, which Mr. Carr read to her after asking her to take notes.

> Mr. and Mrs. Carr also asked that Mrs. Carr immediately be sent the new 48 month extension letter which was publicly authorized by USCIS on 23 Jan 2023, one week before the interview (so USCIS was required to have mailed her a copy of the extension letter before the interview).  The USCIS announcement was also about two months after they had complained to USCIS and the DHS OIG that USCIS had unlawfully left Mrs. Carr stranded in Thailand due to the absence of such a 48 month extension letter.

> They also asked that USCIS send Mrs. Carr a permanent green card as soon as possible as there was now a record in the N-400 case indicating that her N-400 application had not been approved and so there was no basis for withholding the approved green card.

> They also asked that the local representative contact the USCIS director in order to get copies of the emails which properly explained their complaints to date as that was the only method of sending written documents to USCIS for their consideration.

They also asked that the local representative call them back on Monday 18 Sep 2023 at 9AM as Mrs. Carr would be working during normal business hours on Tuesday through Sunday and unable to take calls.  No such callback was made.  (Note: At this time, Mr. Carr was unaware of the scheduling of the interview for 11 Oct 2021 on 06 Sep 2023 and did not receive notice until 15 Sep 2023.)

First Request to Reschedule Interview

194. On 19 Sep 2023, Mr. and Mrs. Carr called USCIS at the prescribed number and spoke with David, ID G009845.  (Note: this request was timely as Mr. Carr only learned of the scheduled interview date on 15 Sep 2023)

They requested that the interview scheduled for 11 Oct 2023 be rescheduled as they had prior plans to be out of the country from 10 Oct 2023 to 25 Dec 2023.

Mrs. Carr asked if the interview could be scheduled for only a day or two earlier but they were told that it could not be scheduled earlier.

Their request to reschedule the interview was assigned ID T1B2622391513DAL.

Upon a lengthy description of the purpose of the ten week trip, David incorrectly summarized the reason for the trip as 'leisure' which raised concerns for Mr. Carr that their trip was not being given appropriate gravity.  They asked that David request that USCIS reschedule for after the completion of their trip on 25 Dec 2023.  It turned out that David was restricted to 80 characters in his request and so described the reason for rescheduling as Mrs. Carr will be out of the country from 10 Oct 2023 to 25 Dec 2023 to increase the likelihood that the individual who responded would be aware of the duration of their trip.

They also asked that Mrs. Carr be provided with a 12 month extension letter as her A-551 stamp would expire on 03 Jan 2023 and if there were health or other problems which delayed their return, she would no longer have proof that she was authorized to work and travel freely.  David assigned sn 30214416 to a request that a local USCIS representative

call Mrs. Carr from 2028382104 to discuss the extension letter.

Unsuccessful Call Back on 21 Sep 2023

195. The call back by the local USCIS representative was made on 21 Sep 2023 in the morning. Mrs. Carr was not home (as she was working) but it was rescheduled for later that evening at 7:30PM when Mrs. Carr was likely to be home.  Mr. Carr called Mrs. Carr and she came home a little early and was home by 7PM but the USCIS representative did not return the call as agreed upon.  No further return calls were made for this request.

Request that Mr. Carr be Mrs. Carr's Authorized Representative

196. Due to the confusion of not being able to get any response from USCIS, on 25 Sep 2023, Mr. and Mrs. Carr called USCIS at the prescribed number and spoke with Martha, ID  G029811.

They asked about how to submit a G-28 appointment of Mr. Carr as the representative in this matter.  They were told to mail the application to:

> ATTN: N-400, G28 submission
>
> 850 NW Chipman Rd, Suite 5000
>
> Lees Summit, MO 64063

An online G-28 request had been submitted on 24 Sep 2023 and the hard copy request was mailed on 26 Sep 2023.  Martha also explained how to submit a document directly to USCIS on their web site and an electronic copy of the G-28 was submitted on 28 Sep 2023.

Martha also explained that USCIS responds to G-28 requests within 30 days.  No response has been received to date on this G-28 request.

Denial of Reschedule Request, Not Sent to Authorized Email

197. While speaking with Martha on 25 Sep 2023, Mr. and Mrs. Carr also learned that on 19 Sep 2023, USCIS had denied their request to reschedule the interview and sent an email to airpk1961@gmail.com, an email address that is rarely monitored.

198. This was not proper.  Before they were married Mrs. Carr had used that email and Mr. Carr had used carrbp@gmail.com.  However, since their marriage they have shared their emails

with both parties having full access to both email addresses.  As they have a legal union, they are not required to maintain separate personal email addresses and now reference all emails to carrbp@gmail.com which is regularly monitored.  In rare cases when businesses insist on separate email addresses for separate persons, they provide Mrs. Carr's old email address, but that address is not regularly monitored.  At no time have they agreed that USCIS should direct email notices to Mrs. Carr's old email address and none of the submissions to USCIS have authorized the use of that email address.  The actual email from USCIS was previously provided to relevant Defendants as USCISnotReschedule20230919.pdf.  It stated in part: "Type of service requested: -- Appointment Reschedule ... USCIS has reviewed your request for a rescheduled appointment, and we regret to inform you that your request has been denied based on the information provided. Failure to comply with your appointment notice or to appear for your scheduled interview may result in adjudication of your application based on the available information."

New request to Reschedule Interview

199. Due to the delay in their receipt of the denial of their request to reschedule the interview (sent on 19 Sep 2023, found on 25 Sep 2023), Mr. Carr uploaded a timely explanation of the reasons for rescheduling the interview on 27 Sep 2023 which has been previously provided to relevant Defendants as PostponeIntervieUntilAfter25Dec2023.pdf along with copies of the flight tickets, date restricted European visas, hotel reservations, required medical insurance coverage and European bus tour tickets, all of which are non-refundable.  The document explains that the purpose of the trip is religious obligations, family obligations, business promotion, business training and education, and leisure.  Planning for the trip was started in Feb 2023 and the leisure portion of the trip was to celebrate the approval of Mrs. Carr's N-400 application for naturalization as USCIS stated in I797forMSC2091582908-ioe9752855294.pdf on 31 Jan 2023.

200. On 2 Oct 2023, Mr. and Mrs. Carr called USCIS at the prescribed number and spoke with Crystal, ID G027432.

Mr. and Mrs. Carr asked that Crystal submit a new request to reschedule the interview based on the documents submitted on 27 Sep 2023.  Crystal explained that they could not

make a new request to reschedule the interview until 15 days after the previous denial on 19 Sep 2023, i.e. 04 Oct 2023 (after the start of Mrs. Carr work week).

They explained that they had provided additional justification for rescheduling the interview which has been uploaded for USCIS to consider.

They asked that USCIS review the uploaded G-28, separately filed online and sent via mail and submitted electronically 28 Sep 2023.  Crystal explained that USCIS has 30 days to act on G-28 requests.

201. On 10 Oct 2023, Mr. and Mrs. Carr called USCIS at the prescribed number and spoke with Antoinette, ID G0023588.

Mr. and Mrs. Carr asked that Antoinette submit a new request to reschedule the interview explaining that it was more than 15 days after the previous denial of the request to reschedule and explained that they had submitted additional documentation.

Antoinette contradicted the previous representative, Crystal, and stated that new requests to reschedule can only be made more than 30 days after a previous denial.   As interviews are scheduled with the nominal 30 days notice (33 days if notice is by mailing), this would ensure that USCIS never reconsiders any denial of rescheduling no matter what the extenuating circumstances.  As this claim also contradicts the previous representative it is likely that Antoinette's and possibly Crystal's claims are false and, hence, federal crimes.

Access to Case Records Unlawfully Denied

202. On 01 Sep 2023, Mr. Carr submitted a request for the entire record in the I-751 and N-400 cases via an online submission of a G-639 FOIA request.  Mr. Carr asked for every email, message, or other records which reference the two receipts in this matter (MSC2091582908 and  IOE9752855294) including both audio and video recordings.  The request was assigned request ID NRC2023277190 and the response was made on 05 Oct 2023.

203. However, the response was only 32 pages and was only the original I-751 and N-400 applications.  On 31 Oct 2023 a new FOIA request was submitted via email a copy of which

was previously provided to relevant Defendants as USCISfoiRqst.pdf.  Note that this is a violation of the applicant's due process right to have access to the evidence against the applicant.  Mr. Carr had requested access to every record which the tribunal relied on to deny the N-400 application, but was denied access to all such records.   It is also possible that the claim that there were only two responsive documents was a federal crime of falsifying government records as it is clear that more records were requested and there was no justification for withholding the other documents.

USCIS Denies N-400 Citizenship Application for Failure to Appear

204. The Decision from USCIS dated 13 October 2023 previously provided to relevant Defendants as USCISdeny20231013.pdf states:

On July 11, 2022, you filed a Form N-400, Application for Naturalization, with U.S. Citizenship and Immigration Services (USCIS) under section 319 of the Immigration and Nationality Act (INA).  After a thorough review of the information provided in your application for naturalization, the documents supporting your application, and your testimony during your naturalization interview, USCIS has determined that you are not eligible for naturalization. Accordingly, USCIS must deny your application for naturalization. ...

On November 13, 2018, you obtained conditional permanent resident status through your spouse and your conditions were removed on January 30, 2023. USCIS received your Form N-400 on July 11, 2022, and on January 30, 2023, you appeared for an interview to determine your eligibility for naturalization.

At the beginning of your naturalization interview, an Immigration Services Officer placed you under oath and then administered the naturalization test. At that time you were unable to write a sentence in ordinary usage of the English language, and answer 6 of 10 U.S. Government and history (civics) questions correctly. Since you did not achieve a passing score on the English or civics portions of the naturalization test, on October 11, 2023, you were scheduled for a second interview to retake these portions of the naturalization test. On October 11, 2023, you did not appear as requested. Further, you have not provided USCIS with a good reason for your absence. Your failure to appear at the second

interview means you have not passed the English or civics testing requirements for naturalization. As a result, you are ineligible for naturalization since you have not demonstrated your ability to pass the English or civics requirements for naturalization. Therefore, USCIS must deny your application for naturalization. See INA 312 and Title 8, Code of Federal Regulations (8 CFR) section 312.5(a) and (b).

If you believe that you can overcome the grounds for this denial, you may submit a request for a hearing on Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, within 30 calendar days of service of this decision (33 days if this decision was mailed). See attached 8 CFR 336.2 (a) and 103.8(b). Without a properly filed Form N-336, this decision will become final. See INA 336.

USCIS Refuses to Provide New Green Card

205. On 19 Oct 2023, Mr. and Mrs. Carr called USCIS at the proscribed number and requested that Mrs. Carr be sent a new Green Card as her I-751 was approved on 31 Jan 2023 but the Green Card was withheld as her N-400 was also approved and her Certificate of Naturalization was imminent. However, the purported Decision of 14 Oct 2023 clearly indicates that USCIS does not intend to provide Mrs. Carr with the promised Certificate of Naturalization in the foreseeable future.

206. This request resulted in a referral of T1B2922301353MSC which concerned 'Non Delivery of Permanent Resident Card'. It was answered on 27 Oct 2023 with the document previously provided to relevant Defendants as USCISnoGreenCard20231027.pdf which listed 'Type of service requested: -- Non-Delivery of Permanent Resident Card' but answered with: "You ... contacted U.S. Citizenship and Immigration Services (USCIS) because you have not received your denial, termination or revocation notice. We have enclosed a copy of the notice for your reference. Please note that we are not able to extend the period for you to file an appeal from this decision. Therefore, follow the instructions on your notice carefully and submit accordingly."

207. There was no notice attached and the text does not make sense with respect to the request for a green card from an approved application. It appears to be the standard form letter message for a denial of a request.

208. The form letter does mention the requirement to contest an unfavorable decision within 30 days and, of course, pay the $700 fee first. However, as this decision referred to was an approval which was illegally contorted by false pretenses to be an effective denial, the text of the response is not responsive to actual request.

209. It appears that when USCIS attempts to effectively deny an application by claiming approval based on false pretenses, there is no way to appeal or correct the error other than the federal district courts.

Legal Arguments

Lack of Jurisdiction

210. Of primary importance is the lack of jurisdiction for USCIS to revise or ignore a prior final decision.

211. It is well understood that in the interest of justice to all parties in an action, there must be some final closure of arguments and litigation. Final decisions are intended to provide that relief to all parties with the caveat that each party has 30 days to notify all other parties of any pending disagreements. This is normally done through a notice of appeal requirement, generally within 30 days after proof of service of the decision by the prevailing party.

212. If USCIS had any complaints or concerns with the findings of facts in the I-751 decision of 31 Jan 2023, they should have raised the concerns within 30 days of publication of the decision.

213. As there is no avenue for USCIS to submit a motion for reconsideration of a matter which was decided by USCIS, the only forum where USCIS can seek redress is a new action in the federal district courts.

214. To provide otherwise is to deny all applicants to USCIS from the justice of having any final decision.

Lack of Notice to Support Failure to Appear

215. Another fundamental principle of due process is that all participants must be given adequate and sufficient notice of any action. It is clearly a travesty of justice to deny an application because of failure to appear when there is no evidence of notice.

216. In particular, in this case there is compelling evidence showing that Mr. Carr did not receive

notice of the upcoming interview until less than 30 days before the interview, i.e. 15 Sep 2023 for a hearing on 11 Oct 2023. As such, the improper denial must be overturned.

Lack of an Independent and Impartial Tribunal

217. One of the fundamental premises of due process is to have matters decided by an independent and impartial tribunal. It is important to recognize that Mr. Carr had filed numerous complaints with the DHS OIG concerning malfeasance and other unlawful activities by USCIS. His final complaints were for the federal crimes of falsifying government records by several employees who reported directly or indirectly to the director who made the final decision.

218. It is absurd to even consider that the Field Office Director, Ms. Montgomery, could be unbiased in resolving a matter in which several of her employees were accused of federal crimes which would surely reflect poorly on her own performance and future career opportunities.

Additional Federal Crimes by Ms Montgomery

219. One of the foundations of any government of law is to have accurate written records of all proceedings. That is almost certainly why Congress has decided to make it a serious federal crime to falsify any government record.

220. When Director Montgomery cited the approval of the I-751 application without mentioning the finding of an approval of the N-400 application, she falsified the record by omitting required facts..

221. When Director Montgomery stated 'Further, you have not provided USCIS with a good reason for your absence.' without mentioning the original request to reschedule she committed the crime of falsifying the record by failing to include required facts. Further, Director Montgomery does not mention the extensive documentation of substantial financial and personal impact required to change long standing plans in order to attend the interview. This evidence was provided to USCIS, and she falsified the record by omitting critical facts.

222. The entirety of her decision is based on timely notice and lack of response but she fails to discuss any of the factors which are critical elements of her decision.

Right of Appeal Prohibitive / Denied

223. The contested decision continues with the following text:

If you believe that you can overcome the grounds for this denial, you may submit a request for a hearing on Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, within 30 calendar days of service of this decision (33 days if this decision was mailed). See attached 8 CFR 336.2 (a) and 103.8(b). Without a properly filed Form N-336, this decision will become final. See INA 336.

224. An initial reading of this paragraph suggests that there are administrative procedures for appealing such bad decisions.  However, while USCIS borrows heavily from judicial terminology in describing their processes and procedures creating the semblance of 'due process', the reality is USCIS does not provide any of the elements of due process.

225. In particular, the required fee to file N-336, request for a hearing, is a hefty $700 while the fee for filing a new N-400 is only $625.  Similarly, the filing fee for a motion to reconsider is also $700 as is the fee for filing a 'Notice of Appeal'.  For a budget minded applicant, the filing fees with federal district courts are a much more affordable $350 (admittedly heavily subsidized) so that applicants with limited assets may only be able to afford to file with the district courts rather than pursue the absurdly expensive administrative alternatives.

226. The likely reason that federal district courts are heavily subsidized is that justice should be provided to all persons and should not be restricted to the wealthy who can afford substantial fees.

Automated Phone System Prevents Applicants from Being Heard

227. It is a violation of due process for USCIS to restrict applicants to an automated phone system for all questions, concerns, requests, and evidence.

228. First of all, USCIS can not require all applicants to have phone access.  They must provide a physical address where applicants and their representative or interpreter can ask questions and present concerns,  requests, issues, and evidence.  Appointments can not be required though substantial waits may be required without an appointment.

229. This in person access is required as each applicant must be permitted to be heard whether they have access to a phone or are technically savvy.

230. Further, it is a violation of due process when the automated phone system hangs up on applicants who are not able to correctly state their needs.  The system must instead pass the request on to a human representative to hear the issues of the applicant though this option

may be deferred during non-business hours and holidays.

231. While providing this human access can be a significant expense, it is required for the due process opportunity to be heard.

232. If USCIS chooses it can also provide online secure messaging to applicants and their representatives as a cost effective way of providing a reliable and less expensive method raising concerns and getting responses.

Difficult Appointment of Spouse as Representative

233. It is a violation of the due process for USCIS to restrict the ability of an I-751 applicant's spouse to represent the applicant.

234. Due process requires the right to representation though not necessarily by an attorney. As the spouse is an American citizen, they almost certainly have better English and U.S. government skills. As such they are ideal representatives for their immigrant spouses.

235. In fact it is completely legal and proper for a spouse to represent the other party as needed in a real legal union (a.k.a. marriage). In truth, one of the signs of a fake marriage would be the absence of the citizen spouse to represent the immigrant spouse.

Inclusive Assumptions for Freedom of Information Act Requests

236. As due process requires that the applicant have full access to all of the evidence presented against him or her, the FOIA default must be to provide all records including audio and video recordings which the tribunal has access to.

Plaintiffs Were Damaged by USCIS's Unlawful Decisions and Actions

237. The refusal of USCIS to provide Mrs. Carr with her Certificate of Naturalization harmed Mrs. Carr by limiting her ability to vote and enjoy other privileges of citizenship. Also, Mrs. Carr has close family members (which includes two sons. a brother, and two sisters including Mrs. Von Kramer) who have been denied their right to apply for immigration and be placed in the queue for Permanent Residence (Green Card) as well as, potentially, citizenship.

**Count 8**

**DHS OIG Takes No Action To Address Criminal Behavior**

238. The Plaintiffs repeat and re-allege paragraphs 1 through 237, as if fully set forth herein.

239. On  4 Dec 2022, Mr. Carr complained via DHS OIG Hotline that Mrs. Carr had been

stranded in Thailand through the unlawful, knowing failure of USCIS to abide by the statutory mandates of 8 CFR Section 216.4 ... "Upon receipt of a properly filed Form I-751, the alien's conditional permanent resident status shall be extended automatically, if necessary, until such time as the director has adjudicated the petition."

240. Mr. Carr was assigned case number HLCN1670132157186 but has not received any further response from DHS OIG.

241. On 5 Dec 2022 expanded on his complaint against USCIS and received case number HLCN1670226793068 but has not received any further response.

242. It is possible that the announcement on 23 Jan 2023 of a new 48 month extension letter was based on Mr. Carr's complaint on 4 Dec 2022 that Mrs. Carr was stranded in Thailand due to the expiration of her 24 month extension letter.

243. However, Mrs. Carr's freedom to work and travel freely was never restored as she never received the 48 month extension letter.

244. On 10 Sep 2023, Mr. Carr notified the DHS OIG directly through the IG of the federal crimes committed by USCIS.  He also opened a complaint via DHS OIG Hotline and was assigned case number HLCN1694292030038.

245. On 13 Nov 2023,  Mr. Carr notified the DHS OIG directly through the IG of the additional federal crimes committed by USCIS as well as the 'whistleblower' retaliation taken by USCIS against Mrs. Carr for Mr. Carr's widespread reports of federal crimes.  Mr. Carr also opened another complaint via DHS OIG Hotline and was assigned case number HLCN1699850033209.

246. It is the DHS OIG's responsibility to not only insure that such serious malfeasance and deprivation of a person's constitutionally guaranteed rights do not happen but also that the harm from failures is redressed to the degree possible by the monitored agency (USCIS in this case).

## Count 8

### DoJ Takes No Action To Address Criminal Behavior

247. The Plaintiffs repeat and re-allege paragraphs 1 through 246, as if fully set forth herein.

248. On 3 Mar 2023 Mr. Carr notified the DoJ Attorney General via mail of the allegations raised against the  USPS, USPS OIG, and USPS BoG.  The DoJ had previously been copied on the allegations as they were raised to the relevant agencies.

249. The DoJ opened reference NM301959635 for the matter with email contact of criminal.division@usdoj.gov, referring the matter to the Postal Inspection Service.

250. On 20 June 2023 Mr Carr notified the DoJ via mail of federal crimes and malfeasance in the DoS and related agencies and asking assistance in correcting the unlawful actions.  Mr. Carr did not request the prosecution of any party.  The DoJ had previously been copied on the various complaints with the DoS agencies.

251. On 8 Sep 2023 Mr. Carr asked for the assistance of the DoJ with respect to the USCIS and related agencies.  The DoJ had previously been copied on the various complaints with the USCIS agencies.

252. On 9 Oct 2023, Mr. Carr again asked the DoJ for assistance with the USPS problems clarifying that he was not seeking prosecution of any party but instead seeking to end the federal crimes and other unlawful practices.

253. On 25 Oct 2023, Mr. Carr again asked the DoJ for assistance in correcting the unlawful practices by CIGIE with respect to failing to maintain proper standards for IG's and OIG employees.  He did not request the prosecution of any party, only assistance in preventing unlawful conduct. .

### Relief Soughts

PRAYER FOR RELIEF

WHEREFORE, The Plaintiffs ask this Court to enter Orders:

### USPS, OIG and DoJ Corrections

1. Directing USPS to provide a credit for future services for $26.35 to Mr. and Mrs. Carr;  In the alternative, USPS can provide a credit to Mr. Carr's credit card (the same card which was charged initially) or a check in that amount to Mr. Carr in the event that USPS finds it too cumbersome to add support for credits for future services to its online web services.

2. Directing USPS to update its dispute / credit process so that postal customers can get guaranteed refunds for late deliveries with a single visit / web form with the presumption that the delivery was late as attested by the customer (and notice that falsifying a government record is a federal crime).

3. Directing USPS OIG to do a preliminary investigation whenever USPS delivery records conflict with the customer's attestation. USPS OIG must refer the matter to DoJ in all cases where there is clear evidence that either the customer or the delivery driver falsified a government record. Due to the automated nature of many USPS records, this determination could be automated to a substantial degree so that USPS OIG staff only need to get involved with cases where there are clear indications of falsification of government records.

4. Directing USPS to promptly correct all incorrect delivery records, certainly before they are accumulated and reported to Congress and the U.S. public or used for computing management bonuses.

5. Directing USPS OIG, DoS OIG, and DHS OIG to expeditiously investigate all plausible allegations of federal crimes. It the event that an OIG does not have sufficient resources to expeditiously investigate all plausible allegations of a federal crime sufficiently to determine if a federal crime is likely, it can refer the matter to local management or other parties for resolution, but it must report all such plausible allegations of federal crimes to DoJ which it does not investigate itself. If an OIG finds that any allegation of a federal crime is likely it must expeditiously report the matter to DoJ whether or not the crime is deemed to be worthy of prosecution. The determination of prosecution is reserved solely to DoJ.

6. Directing DoJ to investigate USPS BoG, USPS management, USPS IG, and USPS OIG management to determine if there were illegal orders preventing USPS OIG staff from reporting federal crimes to the DoJ. If there is evidence of such illegal orders, all such orders must be properly rescinded. Any penalties or prosecution is solely at the discretion of DoJ.

7. Directing DoJ to investigate USPS BoG and USPS management to determine if there were illegal orders encouraging falsifying delivery records (a.k.a. improper 'Stop the Clock' scans). If there is evidence of such illegal orders, all such orders must be properly rescinded. Any penalties or prosecution is solely at the discretion of DoJ.

### Department of State Corrections

8. Directing DoS to provide a credit for future services of $80.00 to Mr. and Mrs. Carr and $624 to Mrs. Von Kramer. These credits can be used by the parties themselves, their family, or their friends. In the alternative, the DoS can provide checks in those amounts to the Plaintiffs in the event that DoS finds it too cumbersome to support these credits in their

otherwise automated payment system.

9. Directing DoS to ensure that all visa denials include clear and specific references to the evidence considered and rationale for denial. All visa denials must be reviewed by supervisors and corrected if there is not clear and specific references to the evidence considered and the rationale for denial. The applicant must be promptly informed of the rationale for the rejection in writing in any case. Any visa denials which are not corrected in this fashion should be referred to the DoS OIG and reported to the DoJ for any such omissions for decisions on prosecution for falsification of government records through omission of required facts.

10. Directing DoJ to work with DoS to ensure that all the elements of Due Process are properly implemented in the visa application review process with particular attention to the right to representation and the right to access all the evidence presented against the applicant.

11. The European Schengen visas could be considered as a starting point as they are able to provide fair and consistent visitor visas at an affordable rate, often relying on global firms who handle much of the burden of collecting and reviewing the required paperwork.

12. Directing DoS OIG to investigate whether there were unpublished unlawful policies or guidance provided to interviewers such as denying non immigrant visas to older widows of deceased American citizens or applicants with concurrent immigration applications. All such policies must be rescinded and any decisions on prosecution is reserved to the DoJ.

13. Directing DoS to evaluate all non-immigrant visa applications since 1 Jan 2018 to the present on a per country basis to determine the denial rate for applications where according the applicant was over 57 years old and marital status listed in the application would be indicative of eligibility for SSA survivors' benefits, specifically deceased spouse who was an American citizen or permanent resident with more than ten years residence and not remarried.

14. DoS is further directed that if the denial rate for the identified applicants is more than one standard deviation higher than all applicants for the specific country, then all identified applicants must be contacted and offered a credit for the prior denied visa application(s), adjusted for any increases in the application fees. Further, the prior applicant must also be provided with the SSA's preliminary determination of current eligibility for survivors' benefits based on the deceased spouse's work history and other dates provided by DoS from

the visa application.

### SSA Order

15. Directing SSA to reconsider the finding that Mrs. Von Kramer's does not have five years of lawful presence in the United States.  As Mrs. Von Kramer was unlawfully prevented from visiting the United States in 2019, 2020 and 2021 with the stated goal of, among other things, establishing a lawful presence, the SSA is directed to credit her with having met the requirements of lawful presence for those three years.  If her actions in 2022 and 2023 or later years meet the requirements for lawful presence, then Mrs. Von Kramer must be held to have established a lawful presence in the United States and granted the benefits thereof.

16. Any DoS identified applicants whose previous non-immigrant visas may have been improperly denied as determined above and who later are granted non-immigrant visas should also be given letters from the DoS stating that the applicant may have been denied prior visa applications unlawfully and asking that SSA credit the applicant with 'lawful presence' for the years when they may have been unlawfully denied the ability to visit the U.S. with the letter identifying the date of the first improper denial and the date of the first approved visa.

### CIGIE Corrections

17. CIGIE must review its standards and policies to ensure that all IG's and OIG employees are aware of the requirements to expeditiously investigate and report federal crimes.  In the event that a particular OIG does not have sufficient resources to expeditiously investigate all plausible allegations of a federal crime sufficiently to determine if a federal crime is likely, it can refer the matter to local management or other parties for resolution, but it must report all such plausible allegations of federal crimes to DoJ which it does not investigate itself.  If a particular OIG finds that any allegation of a federal crime is likely it must expeditiously report the matter to DoJ whether or not the crime is deemed to be worthy of prosecution.  The determination of prosecution is reserved solely to DoJ.

18. Directing the DOJ to investigate the failure of CIGIE to itself promptly investigate and report federal crimes.  All such practices and policies which led to past failures must be rescinded.  The decision on penalties and prosecution are reserved solely to the DoJ.

### USCIS Corrections

Credit for Visa Fees when Stranded Overseas

19. Directing USCIS to provide a credit for future services with USCIS to Mr. and Mrs. Carr for $80 for use on their behalf as well as their family members and friends. This credit is half of the business / tourist visa application fee which was required in order for Mrs. Carr to return to the U.S. when she was stranded in Thailand in 2022. The fee was $160, but DoS has been requested to provide the other half for their unlawful denial of such a visa to Mrs. Carr in 2017. In the alternative USCIS may choose to provide checks to all injured parties as an alternative to credits for future services in this and other reparations, but this is solely at the option of USCIS. It is possible that the total reparations requested may justify handling them as credits for future services.

Right to work and travel freely as well as right to vote

20. The primary relief sought is for Mrs. Carr to receive her Certificate of Naturalization as soon as possible. However, specific relief sought include orders directing:

A. Mrs Carr should receive her 48 month extension letter or a 1 year extension letter as soon as possible, specifically within one week of the date of issuance of the court's order.

B. Mrs Carr should receive her 10-year Permanent Resident Card as soon as possible. Specifically within one month of the court's order.

C. Mrs. Carr should have her Oath of Allegiance ceremony scheduled and completed within 1 month and her Certificate of Naturalization issued within 2 months of the court's order.

In the event that this court determines that it does not have jurisdiction to fully order the implementation of the Final Decision of 31 Jan 2023 approving both of Mrs. Carr's I-751 and N-400 applications, the court is asked review the Denial of Mrs. Carr's N-400 application on 14 Oct 2024 'de novo' per 8 USC section 1421(c).

Credit for Delay in Granting Citizenship

21. Directing USCIS to credit Mrs. Carr with additional credits for the deprivation of the rights of citizenship to include the rights for close family members to seek immigration authorizations as well as the right to vote and such. As it is not possible retroactively grant Mrs. Carr the right to vote and others rights of being a U.S. citizen (such as the right to visit Europe without a European visa) the family members should be credited with twice the delay in her citizenship, i.e. their position in the queue for immigration visas should be

adjusted as if their application was received earlier.  The doubling of their credit in queue position corrects not only the delay in their application but also they get their citizenship rights (e.g. voting) earlier in compensation for the deprivation of Mrs. Carr's citizenship rights (e.g. voting).  For Mrs. Carr the computation of the credit for family members immigration should be based on the delay in citizenship which should be from 13 Nov 2021 to the date when her Certificate of Citizenship is actually given to her.  The 2021 is used because that is the earliest date that Mrs. Carr was eligible to become a citizen and is in recognition of the unwarranted challenges and barriers USCIS placed on her citizenship. Indeed Mrs. Carr would have become a citizen on that date had USCIS permitted it.

Credit for  Extraneous I-751 Fees

22. Directing that Mrs. Carr be given a credit for future services with USCIS for the extraneous I-751 application fees of $680 which were duplicated with N-400 services (interview and biometrics).  Mrs. Carr never received any I-751 specific services and should not have been charged for the services.  This credit can be used for future services with USCIS for herself, her family, Mr. Carr's family, or Mr. or Mrs. Carr's friends.

Review of Other I-751 and N-400 Records

23. Directing that USCIS databases should be queried for all I-751 records processed since 1 Jan 2018 to determine how many other records were similarly falsified.  In particular, how many I-751 applications by quarter were approved but with no permanent resident card or Certificate of Naturalization issued within 90 days.

24. If the identified applicants are found to have a statement in the I-751 approval that the corresponding N-400 had been approved then these applicants should be issued a Certificate of Naturalization as soon as possible if they have not already been issued said certificate.

25. All such applicants should be similarly credited for future services with USCIS for their use, their families use, or their friends use for the cost of the I-751 application fee.  In addition, any relatives who apply for immigration visas based on their citizenship status should be credited with double the time of the original applicant's delay.  The delay is computed to be from the date of the I-751 claim of N-400 approval to the actual date of issuance of a Certificate of Naturalization.

26. If the number of applicants and immigration credits are so large as to substantially impact current immigration queue members, USCIS is directed to apply to Congress to get

sufficient additional slots for each country so as to preserve the integrity of the queue for that country.

Falsified Records Must Be Corrected

27. Further, all falsified records should be deleted (actually hidden to avoid potential database corruption) with new records of a falsified record being inserted at the same date and time of the deleted/hidden record.  There should be an additional corresponding record at the current date and time which includes the content of the falsified record for later review.

28. All reports to Congress and other entities which relied on these falsified completion records must be revised to note the number of records which were previously recorded as processed, but were actually pending correction of the false resolution.  The corrected resolutions should be added to current reports as approvals from previously denied falsified records (a new category).

Adjustments for Language / Cultural Differences

29. Just as USCIS has added exemptions for people with medical impairments, as well as exemptions based on age, USCIS is directed to extend these exemptions to consider the education opportunities presented to a particular individual before they were 21. They should also be extended to consider the difficulty in mastering English based on the nation of birth.

30. For example, there could be an annual review by country of the rate of application for citizenship as well as the rate of granting citizenship.  Exemptions should be granted to individuals from countries like Thailand where mastering English is extremely difficult for those who are older and poorly educated.  The exemptions should be granted based on age less years of formal training in English before they were 21 and sufficient to correct the rate of citizenship approvals to match those of countries such as Canada or the United Kingdom where the rate of granting citizenship is, presumably, highest.

31. The approval rate would be the number of approvals from a particular country divided by the number of permanent residents from that country who are eligible to apply for citizenship, not the number who actually apply.  It is expected that there will be a large backlog of residents form Buddhist / Muslim countries who would like to be citizens but did not apply because the English and Civics test was too difficult for them to pass based on their lack of exposure to English in their youth.

32. For countries such as Thailand and other Buddhist / Muslim countries, this would likely mean eliminating the English and civics test for all N-400 applicants for a few years until the rate of granting citizenship matches that of Canada or the United Kingdom. This would be a valuable correction to eliminate the past unlawful discrimination against certain groups based on religion, race, culture, and age.

### USCIS Must Correct Time For Legal Notice

33. USCIS be directed to allow more time for timely notices of actions. If USCIS wishes to update its notice process to record and publish accurate records of the actual date of mailing of notices, 7 days could be added to the actual date of mailing for notices. Three days for first class mail is insufficient to be confident of prompt receipt.

34. As it generally takes USCIS 6 days to print a notice and prepare it for mailing, this would normally be 45 days after the date of the decision itself to allow for unforeseen delays in processing before and after mailing.

35. Of course, any denials based on assumed notice without an accurate record of delivery (signature required mailing or process server), would be conditional and must be easily contestable in the event that there was not actual timely delivery. The applicant must be able to contest the denial without any additional fees by explaining any extenuating circumstances which prevented timely notice or appearance (e.g. applicant was in the hospital and did not receive the notice or was not able to appear or answer while hospitalized).

36. For all cases where USCIS denied an application for failure to appear and there was not 45 days notice nor any record of the actual date of mailing, all such actions since 1 Jan 2018 must be remanded to USCIS for proper processing overturning all denials where there was not proof of timely notice.

37. The applicant must be given a credit for the filing fees for the original application as well as having the application opened again for proper consideration. All denial records must be updated to note the denial was overturned due to lack of notice. All reports to Congress and others which were based on the improper denial (showing an application was processed) must be corrected to show that the application was incorrectly denied and has been returned to an active status.

### Adjustment of USCIS Fees for Appeal, Reconsideration

38. USCIS fees for N-336 requests to review, motions to reconsider, notice of appeal, and actual appeal filing must be reduced so that they are not prohibitive. It is suggested that no motion to argue or motion to reconsider should cost more than 5% of the federal district court filing fee (now $350, hence no more than $17.50). Actual appeal filing fees should not exceed half the district court filing fees, e.g. $175. There must be no fee for N-336 and other motions to reconsider when the applicant is contesting presumptive / conditional denials for failure to appear as the applicant must be provided the opportunity to explain failures in actual notice or extenuating circumstances which prevented appearance or answering (e.g. hospitalization).

39. The justification for this is to encourage applicants to seek redress with the USCIS rather than going directly to the district courts. It also furthers due process by making the proceedings fair and providing opportunities for applicants to be heard / argue their cases as necessary.

USCIS Must Restore Interview Waivers and

Cease Criminal Background Reviews for I-751 Applications

40. The administrative policies implemented by the prior USCIS director in the 2018 time frame must be rescinded. They do not provide any improvement in enforcement and greatly harm applicants' rights in these matters. They are also in direct violation of the waiver or interview within 90 days requirement explicitly stated in 8 CFR Section 216.4(b)(1) and cited above.

41. Mrs. Carr is requesting that interview waivers be resumed at an accelerated rate so that at least 2 months of backlog are eliminated each month. Realistically that means that three months of applications must be granted their permanent resident card each month without the optional interview and without further delay.

42. This should eliminate the current illegal four year backlog within two years.

43. Once the backlog is reduced to three months the accelerated approvals can be eliminated and mandatory approvals without interview will only be for those applications which have languished in the queue for up to three months and the total number of pending applications exceeds the number of new applications.

44. If there are concerns about applicants not understanding the criminal background questions in English, USCIS can provide written copies of the criminal background questions

translated into all the appropriate languages. However, these questions should only be applied to new applicants for immigration visas, not approved permanent residents.

45. USCIS should immediately begin with interview waivers for the oldest applications, but if USCIS wishes, it can send out new forms to potential waiver recipients asking for authorization to access all of their social media, mobile and credit rating records for both spouses. Failure to provide authorization or the appropriate accounts and addresses would result in a delay of any interview waivers. All applicants who authorized full electronic access to their records could be granted waivers before applicants who did not provide such access though the delay in the scheduling of an interview is restricted to 90 days in 8 CFR Section 216.4(b)(1) in all cases.

46. Over time, USCIS could develop AI programs which very accurately identify fake marriages based on the contents or lack of social media and other records. Given the vast amount of information available through phone records (e.g. Google's timeline which could show the location of each spouse for every day and night of their purported marriage), social media and credit histories, the interview itself appears to be a highly ineffective and very expensive method of identifying fake marriages. A well trained AI program could identify fake marriages with substantially greater accuracy at a fraction of the cost of interviews.

Required Access Provided to Applicants

47. USCIS must immediately disable hang ups by the automated phone system and instead fail over to a human representative. Further, USCIS must send notices to all active applicants of the address where they can go without any appointment to ask questions and raise concerns. USCIS must respond to in person questions, concerns and requests.

48. Secure messaging systems are now relatively routine technology and should be offered as an addition to the MyUSCIS web page to provide a more reliable and cost effective alternative for those applicants who choose to use this option. It is absurd to require technically savvy applicants or their representatives to navigate the lengthy automated phone system to get to speak to a person who will reduce their input to 80 characters at great expense to USCIS and great information loss from incomplete or inaccurate transcription.

USCIS Must Guarantee Applicants' Right to Representation

49. USCIS must grant immediate approval to any spouse who files to become an applicant's representative. Further, the application form itself must be adjusted to allow that option on

the application itself.

50. Pending I-751 applicants must be notified immediately of their ability to add their spouse as a representative via a simple phone call.

More Expansive FOIA Responses

51. USCIS must change its defaults for FOIA requests to provide access to every record including audio and video recordings which reference the requested receipt number.

### DHS OIG Corrections

52. Directing DHS OIG to ensure that it promptly investigates and reports all federal crimes as described above.  Further, while the decision to prosecute resides solely with the DoJ, the DHS OIG needs to ensure that serious malfeasance such as depriving foreign nationals of their constitutional rights is promptly investigated and corrected.  Further, the DHS OIG must ensure that appropriate and timely redress is provided to injured parties.

53. For example, if a foreign national is unlawfully stranded overseas, the DHS OIG must ensure that the offending agency corrects the defect promptly, perhaps sending a PDF file with the required extension letter via email to the stranded party in time to not hinder their travel plans.  The 23 Jan 2023 approval of a 48 month extension letters was too late and was not provided to the injured party in this case.

### DoJ Corrections

54. Directing the DoJ to investigate and track all plausible allegations of federal crimes as necessary to insure that the criminal behavior is not repeated and that injured parties receive appropriate redress.  It is acceptable for local OIG's or even local management to complete the bulk of the investigations as long as the DoJ monitors the results and does not forego the option of criminal prosecution until adequate remediation is put in place to prevent future crimes and redress is provided to all injured parties.

55. Directing the DoJ to investigate all failures of OIG's to expeditiously report plausible federal crimes to the DoJ as described above.  Any failures to report federal crimes must be investigated as potential 'obstruction of justice' crimes though prosecution remains the purview of the DoJ and the threat of prosecution should be used as a cudgel to insure future adherence as well as redress when appropriate.

56. Granting the Plaintiffs such additional relief as the interests of justice may require, together

with their costs and disbursements in maintaining this action.

Respectfully submitted,

Verification of Complaint

We the undersigned Plaintiffs hereby affirm under penalty of perjury in both the United States and Thailand that as individuals:

1. I have reviewed the allegations and believe all of the allegations to be true to the best of my knowledge.
2. I have reviewed the associated documents and exhibits and believe them to be true and accurate copies with the exception of the documents identified as being redacted.  The redacted documents have only been altered to remove sensitive personal information according to normal redaction procedures.

I hereby reaffirm that the above is true to the best of my knowledge under penalty of perjury in both the United States and Thailand.

/s *Brian P. Carr*
_____
Brian P. Carr
1201 Brady Dr
Irving, TX 75061
Date:    27 Mar 2024
Location: Irving, TX

/s *Air Carr*
_____
Rueangrong Carr
1201 Brady Dr
Irving, TX 75061
Date:    27 Mar 2024
Location: Irving, TX

*/s Buakhao Von Kramer*
_____
Buakhao Von Kramer
105 - 3 M 5 T YANGNERNG
SARAPEE, CHIANG MAI 50140 THAILAND
Date:    27 Mar 2024
Location: Irving, TX

CERTIFICATE OF SERVICE

On the recorded date of submission, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I also hereby certify that on this same date no copies were served via U.S. mail as all parties in this matter were enrolled in the court's electronic case filing (and service) system.

/s *Brian P. Carr*

_____

Brian P. Carr
1201 Brady Dr
Irving, TX 75061

CERTIFICATION OF ELECTRONIC SIGNATURES

In accordance with TXND LR 11.1(d), on the recorded date I received permission from Mrs. Carr and Mrs. Von Kramer to sign this document electronically on their behalf after having provided them with the relevant sections of the document in English and translated into Thai (relying on Google Translate).  We then discussed the documents in English (as Google Translate does always provide meaningful translations) and the only concerns about accuracy was Mrs. Von Kramer's concern that the document specifies precise dates and times for the various visa interviews and she really does not remember that level of detail about those events (several years ago).

I assured Mrs. Von Kramer that the dates and times were established from the electronic records of the appointment (e.g. the official appointment document to allow applicant entry into the consulate) which I had retained.  I explained that her signature does not indicate she remembers the interviews being on that date at that time but rather that she has no knowledge or recollection to the contrary.  She does remember interviews of that nature in that time frame.

In turn, I must qualify that almost none of the details in this now sworn statement (no longer allegations) were based on my recollection but rather careful review of electronic records which I have retained and maintained and which I believe to be accurate.

*/s Brian P. Carr*
_____
Brian P. Carr
1201 Brady Dr
Irving, TX 75061

Date:            28 Mar 2024
Location:        Irving, Texas